## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARINO KAIN, WAYNE KERRIS, PERRY RUSSELL, Derivatively On Behalf Of NEOGENOMICS, INC., | **Case No.:** |
| Plaintiffs, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| LYNN TETRAULT, ALISON HANNAH, BRUCE CROWTHER, MICHAEL KELLY, STEPHEN KANOVSKY, DAVID PEREZ, RACHEL STAHLER, DOUGLAS VANOORT, MARK MALLON, KATHRYN MCKENZIE, AND WILLIAM BONELLO, | **JURY DEMANDED** |
| -and- | |
| Defendants, | |
| -and | |
| NEOGENOMICS, INC., | |
| Nominal Defendant. | |

Plaintiffs Marino Kain, Wayne Kerris and Perry Russell ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant NeoGenomics, Inc. ("NeoGenomics" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by NeoGenomics with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and

matters of public record.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by NeoGenomics directors and officers from February 27, 2020 to the present (the "Relevant Period").

2.      On May 8, 2023, Plaintiffs made a demand (the "Demand") on the Board of Directors (the "Board") to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants (defined below) – to recover, for the benefit of the Company, the damage caused to it.  Attached hereto as **Exhibit A**, respectively, is a true and correct copy of the Demand.

3.      Following this, on May 26, 2023, counsel for the Board assured Plaintiffs that a response would be "forthcoming in the near term." Attached hereto as **Exhibit B** is a true and correct copy of counsel for the Board's response.

4.      However, to date, no such response has been received. Accordingly, Plaintiffs' counsel sent several follow-up communications to counsel for the Board and are yet to receive any substantive response to the Demand.  Thus, the Board's inaction here constitutes a refusal of Plaintiffs' Demand.

5.      The Board's refusal to commence a civil action for an undetermined amount of time, if at all, is an improper and wrongful refusal of the Demand.   Thus, Plaintiffs rightfully bring this action in the right and for the benefit of the Company to recover for the damages caused to the Company by the Individual Defendants. As such, this derivative action should be permitted to proceed.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), and SEC Rule 10b-5, 17 C.F.R. §§ 240.10b-5, promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331 because this is a civil action arising under the laws of the United States of America.

7.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

8.      This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Individual Defendants (defined below) have conducted business in this District, and the Individual Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiffs**

11.      Plaintiffs acquired the Company securities and will continue to hold the Company shares throughout the pendency of this action.  Plaintiffs will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

12.    Nominal Defendant NeoGenomics is a Nevada Corporation, with its principle executive offices located at 9490 NeoGenomics Way, Fort Myers, FL 33912.

**Director Defendants**

13.    *Defendant Lynn Tetrault* ("Tetrault") is the Company's current Executive Chair of the Board and has served in that capacity since March 28, 2022.

14.    *Defendant Alison Hannah* ("Hannah") has served as a Company director since June 2015.  She also serves as a member of the Compliance Committee and Nominating and Corporate Governance Committee.

15.    *Defendant Bruce Crowther* ("Crowther") has served as a Company director since October 2014.  He also serves as a member of the Audit and Finance Committee.

16.    *Defendant Michael Kelly* ("Kelly") has served as a Company director since July 2020.  He also serves as the Chair of the Audit and Finance Committee.

17.    *Defendant Stephen Kanovsky* ("Kanovsky") has served as a Company director since July 2017.  He also serves as a member of the Compliance Committee, and the Nominating and Corporate Governance Committee.

18.    *Defendant David Perez* ("Perez") is a member of the Board.  Defendant Perez is also a member of the Audit and Finance Committee.

19.    *Defendant Rachel Stahler* ("Stahler") has served as a Company director since May 2020.  Defendant Stahler also serves as a member of the Audit and Finance Committee.

20.    Defendants Tetrault, Hannah, Crowther, Kanovsky, Kelly, Perez and Stahler are sometimes referred to hereinafter as the "Director Defendants."

**Prior Board Member**

21.    *Defendant Douglas VanOort* ("VanOort") served as the Company's CEO until

April 19, 2021, at which time he transitioned to become the Executive Chair of the Board of Directors of the Company.  On October 12, 2021, the Company announced that Defendant VanOort would be stepping down as Executive Chair and would retire as a member of the Board before the end of the year.

**Executive Officers**

22.　*Defendant Mark Mallon* ("Mallon") served as the Company's CEO from April 19, 2021 to March 28, 2022.

23.　*Defendant Kathryn McKenzie* ("McKenzie") served as the Company's CFO until December 31, 2021.

24.　*Defendant William Bonello* ("Bonello") is the Company's current CFO and has served in that capacity since January 1, 2022.  Previously, Defendant Bonello served as President of the Company's Informatics Division.

25.　The Director Defendants along with Defendants VanOort, Mallon, McKenzie and Bonello are herein referred to as the "Individual Defendants".

## THE COMPANY'S CORPORATE GOVERNANCE

26.　As members of Board were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

27.　The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of NeoGenomics, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers, directors, and/or fiduciaries of NeoGenomics and because of their ability to control the business and corporate affairs of NeoGenomics, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage NeoGenomics in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of NeoGenomics and its shareholders.

29.     Each director and officer of the Company owes to NeoGenomics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of NeoGenomics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with NeoGenomics, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of NeoGenomics.

31.     To discharge their duties, the officers and directors of NeoGenomics were required

to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of NeoGenomics were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) Remain informed as to how NeoGenomics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) Ensure that all decisions were the product of independent business judgment

and not the result of outside influences or entrenchment motives.

32.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of NeoGenomics, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.     The Individual Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.   The Individual Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities class action entitled *Goldenberg v. NeoGenomics, Inc., et al.*, Case 1:22-cv-10314 (S.D.N.Y.) ("Securities Class Action").   As a result, NeoGenomics has expended, and will continue to expend, significant sums of money.

34.     The Individual Defendants' actions have irreparably damaged NeoGenomics's corporate image and goodwill.

## THE AUDIT COMMITTEE

35.     The principal responsibilities of the Audit Committee are to assist the Board in fulfilling its oversight responsibilities.

36.     The Audit Committee Charter provides that its members shall:

The Audit Committee (the "Committee") shall provide assistance to the Board of Directors ("Board") of NeoGenomics, Inc., a Nevada corporation (the "Corporation"), in fulfilling its responsibilities with respect to its oversight of:

(i)     The quality and integrity of the Corporatio's financial statements;

(ii)    The Corporation's compliance with legal and regulatory requirements;

(iii)   The Corporation's enterprise risks, including but not limited to risks relating to the Corporation's information technology use and protection, data governance, privacy, and cybersecurity, and the Corporation's strategy to mitigate such risks;

(iv)    The independent auditor's qualifications and independence;

(v)     The performance of the Corporation's internal audit function and independent auditors; and

(vi)    Working in coordination with the Compliance Committee of the Board of Directors, the implementation and effectiveness of the Corporation's ethics and compliance program.

**<u>Background</u>**

37.    The Company operates a network of cancer testing laboratories in the United States, Europe and Asia.  The Company operates two business segments: (i) the Clinical Services Segment provides testing, interpretation, and consultative services to community-based pathology practices, hospital pathology labs, reference labs, and academic centers and (ii) the NeoGenomics's Pharma Services Segment supports pharmaceutical firms in their drug development programs by supporting their clinical trials and research through working with the pharmaceutical firms on study design as well as performing required testing.  In 2021, the Clinical Services Segment accounted for 83% of the Company's revenue, while the Pharma Services Segment accounted for 17% of the Company's revenue.

38.    The Company offers a variety of cancer tests, including tests utilizing NGS technology.  NGS allows clinicians to test multiple genes of a cancer simultaneously on material extracted from a single biopsy or sample of a patient's blood.  NGS tests have grown in popularity in recent years among pathologists because they are typically more cost effective and efficient than legacy tests, which are typically focused on looking for one single genetic mutation and, often require pathologists to order several individual tests to look for multiple genetic mutations.

## THE FALSE AND MISLEADING STATEMENTS

39.     On February 27, 2020, the Company announced its fourth-quarter and full-year 2019 financial results and held a conference call to discuss the results (the "4Q19 Earnings Call"). During the 4Q19 Earnings Call, Defendant VanOort stated: "we have really restructured in some respects our NGS panels, and we think they are very, very high-quality panels.  We continue to make improvements in them in terms of the number of genes and in our reporting capabilities, and the marketplace is reacting very favorably to that.  So our next-generation sequencing panels in the clinical business should continue to fuel growth."

40.     On February 28, 2020, the Company filed its annual report for 2019 on Form 10-K with the SEC (the "2019 Form 10-K").  The 2019 Form 10-K contained the following statement touting the Company's testing capabilities:

> NGS panels are one of our fastest growing testing areas and clients can often receive a significant amount of biomarker information from very limited samples. These comprehensive panels can allow for faster treatment decisions for patients as compared to a series of single-gene molecular tests being ordered sequentially. NeoGenomics has one of the broadest Molecular menus in the industry and our targeted NeoTYPE panels include genes relevant to a particular cancer type, as well as other complementary tests such as immunohistochemistry and FISH.  This comprehensive menu means that NeoGenomics can be a one-stop-shop for our clients who can get all of their oncology testing needs satisfied by our laboratory. This is attractive to our clients as patient samples do not need to be split and then managed across several laboratories.  NeoGenomics expects our Molecular laboratory and NGS capabilities to be a key growth driver in the coming years.

41.     In the 2019 Form 10-K, the Company further represented that its "Competitive Strengths" included testing "Turnaround Times" and "Innovative Service Offerings."  Regarding turnaround times, the Company stated: "Our consistent timeliness of results by our Clinical Services segment is a competitive strength and a driver of additional testing requests by referring physicians.  Rapid turnaround times allow for the performance of other adjunctive tests within an acceptable diagnosis window in order to augment or confirm results and more fully inform

treatment options." Regarding its service offerings, the Company stated: "Our [testing] menu enables us to be a true one-stop-shop for our clients as we can meet all of their oncology testing needs ."

42.     Additionally, in the 2019 Form 10-K, the Company touted its efforts to comply with relevant government regulations and listed failure to comply with such regulations as a risk, without discussing the ongoing violations, stating:

> The health care industry is highly regulated and scrutinized with respect to fraud, abusive billing practices and improper financial relationships between health care companies and their referral sources. The Office of the Inspector General of HHS ("OIG") has published compliance program guidance, including the Compliance Program Guidance for Clinical Laboratories in August of 1998, and advisory opinions. The Company has implemented a robust Compliance Program, which is overseen by our Board of Directors. Its objective is to ensure compliance with the myriad of international, federal and state laws, regulations and governmental guidance applicable to our business. Our program consists of the development and implementation of standards of conduct, training/education of employees, monitoring and auditing Company practices, investigation, and response to reported or detected compliance issues.

> ***

> Our operations are subject to strict laws prohibiting fraudulent billing and other abuse, and our failure to comply with such laws could result in substantial penalties. Of particular importance to our operations is ensuring compliance with federal and state laws prohibiting fraudulent billing and the retention of overpayments. In particular, if we fail to comply with federal and state documentation, coding and billing rules, we could be subject to liability under the federal False Claims Act, including civil penalties, loss of licenses and exclusion from the Medicare and Medicaid programs.

> ***

> Existing federal laws governing Medicare and Medicaid, as well as some other federal laws, also regulate certain aspects of the relationship between healthcare providers, including clinical laboratories, and their referral sources, including physicians, hospitals, and other laboratories. . . . Violation of these laws may result in criminal penalties, exclusion from participation in the Medicare, Medicaid, and other federal healthcare programs, repayment of all reimbursement received by us related to services tied to any impermissible referrals, and significant civil monetary penalties . . . We seek to structure our arrangements with physicians and other

clients to be in compliance with the federal AKS, Stark Law and similar state laws, and to keep up-to-date on developments concerning their application by various means . . .

43.     On April 28, 2020, the Company held a conference call to discuss its first-quarter 2020 financial results (the "1Q20 Earnings Call").  During the 1Q20 Earnings Call, Defendant McKenzie stated: "Prior to the impacts of COVID-19, we were once again seeing growth across all testing modalities, with particular strength in next-generation sequencing and molecular testing."

44.     On April 29, 2020, the Company filed its first-quarter 2020 Form 10-Q with the SEC ("1Q20 Form 10-Q"), which contained nearly identical statements to those referenced above, touting the Company's testing capabilities and competitive strengths.

45.     On May 28, 2020, the Company held its Annual Shareholders Meeting.  During the meeting, Defendant VanOort stated: "we compete . . . by being a one-stop shop.  So for an oncology practice or for a hospital system, they can use NeoGenomics to do all of their testing, not just next-generation sequencing, but also immunohistochemistry testing, fish testing, flow cytometry and everything else."

46.     On July 28, 2020, the Company held a conference call to discuss the Company's second-quarter 2020 financial results ("2Q20 Earnings Call").  During the 2Q20 Earnings Call, Defendant VanOort stated: "We now have a full suite of liquid biopsy tests, which further strengthens our next-generation sequencing product portfolio and solidifies our comprehensive oncology test menu."

47.     On July 31, 2020, the Company filed its second-quarter 2020 Form 10-Q with the SEC, which contained nearly identical statements to those referenced above, touting the Company's testing capabilities and competitive strengths.

48.     On September 14, 2020, the Company participated in the Morgan Stanley Global Healthcare Conference.  During the conference, Defendant VanOort stated, "we are a one-stop shop for clients, physicians, pathologists, hospitals and pharmaceutical companies. We use every kind of testing modality that you can use for cancer, including some of the fast-growing new ones, like next-generation sequencing, but we do everything.  So we're a one-stop shop."

49.     On October 27, 2020, the Company held a conference call to discuss the Company's third-quarter 2020 financial results ("3Q20 Earnings Call").  During the 3Q20 Earnings Call, Defendant McKenzie stated: "gross margins improved approximately 1,100 basis points sequentially to 43%, reflecting a strong recovery in both clinical and pharma revenues on largely fixed COGS infrastructure."

50.     On October 29, 2020, the Company filed its third-quarter 2020 Form 10-Q with the SEC, which contained nearly identical statements to those referenced above, touting the Company's testing capabilities and competitive strengths.

51.     On January 11, 2021, the Company participated in the JPMorgan Healthcare Conference.  During the conference, Defendant VanOort stated:

> NGS is a technology that allows us to interrogate a number of genes all simultaneously. And there are a lot of different applications for next-generation sequencing. There are small panels and large panels and targeted panels, DNA panels and RNA panels and some with both DNA and RNA. We can use nextgeneration sequencing for tissue samples or for circulating tumor samples, also referred to as liquid biopsy, and more. And consistent with NeoGenomics' comprehensive approach to our test menu, we also offer a wide variety of and range of next-generation sequencing tests. And this is one of the things that differentiates NeoGenomics. And we believe that we have a very high quality capability to meet the needs of nearly any client . . .

52.     On February 24, 2021, the Company held a conference call to discuss its fourth quarter and full year 2020 financial results ("4Q20 Earnings Call").  During the 4Q20 Earnings Call, Defendant McKenzie stated: "gross margins improved approximately 250 basis points

sequentially in the fourth quarter to 45.6%, reflecting a continued recovery in both Clinical and Pharma revenues on a largely fixed cost COGS infrastructure."

53.    On February 25, 2021, the Company filed its annual report for 2020 on Form 10- K with the SEC ("2020 Form 10-K").  The 2020 Form 10-K contained nearly identical statements to those referenced above, touting the Company's testing capabilities and competitive strengths.  The 2020 Form 10-K also contained substantially the same statements identified above, touting the Company's efforts to comply with relevant regulations and merely listing failure to comply with such regulations as a risk, without discussing the ongoing violations.

54.    On May 27, 2021, the Company held its Annual Shareholders Meeting.  During the meeting, Defendant Mallon informed investors: "Another core strength is the breadth of our Test Menu.  We cover all of the key modalities in cancer testing.  As I mentioned, over 700 tests and this includes the fastest growing, which is the molecular test, where we bring – have a unique position, where we actually try to customize the types of molecular tests, the panels, the number of mutations to be tested and not just molecular, but also adding in the necessary additional modalities to really get the most precise, customized, cost-effective solution for a particular cancer or a particular patient."

55.    On June 9, 2021, the Company participated in the Goldman Sachs Global Healthcare Conference.  During Defendant VanOort's prepared remarks, he stated: "we have the most comprehensive test menu that anyone has for oncology out there" and "[o]ne of the things that is quite unique and a competitive advantage is we are a go-to reference lab with a comprehensive menu for just about any kind of tests that you want to have done in cancer. . . . And so we have been a go-to one-stop shop reference lab for a lot of players in the ecosystem, and we keep our test menu very advanced. And it's a real advantage for us."  Later during the

conference, Defendant VanOort stated: "next-generation sequencing has a lot of different kinds of – it's not just one flavor. I mean you can do next-generation sequencing for solid tumors. You can do it for hematologic cancers. You can do it for targeted profiles, large profiles, DNA, RNA, it's all kinds of stuff, various aspects.  You can also do now liquid biopsy next-generation sequencing. And effectively, we do it all."

56.     On August 6, 2021, the Company held a conference call to discuss its second quarter 2021 financial results ("2Q21 Earnings Call").  On the 2Q21 Earnings Call, Defendant Mallon stated:

> I've been very impressed by several strengths of Neo in my first 100 days on the job. First, it's just how comprehensive our oncology platform at NeoGenomics truly is.  As I have dug in, I see how our broad portfolio of services provides a value proposition to all the constituents of the oncology ecosystem, providers, . . . payers and of course, patients. Our portfolio of multi-modality solutions is comprised of hundreds of assays that provide time-sensitive biomarker-specific answers for oncologists, pathologists, research scientists and pharma trial teams. Our customized targeted panels allow us to provide the right information at the right time for providers to patients at the right price for our direct bill and third-party payers. And that broad-based menu that differentiates [us] in clinical is also great value to our biopharma customers and is a real driver of growth for us.

57.     Also, on the 2Q21 Earnings Call, Defendant McKenzie stated: "our gross margins improved to 44.1% in quarter 2, driven by efficiencies on increased volume in clinical and higher revenue in our Pharma Services division. More consistent sample volumes allow for more predictable staffing levels, and we were able to see more normalized leverage on our largely fixed cost COGS infrastructure."

58.     On August 9, 2021, the Company filed its second-quarter 2021 Form 10-Q with the SEC, which contained nearly identical statements to those referenced above, touting the Company's testing capabilities and competitive strengths.

59.     On November 4, 2021, the Company held a conference call to discuss its third

quarter 2021 financial results ("3Q21 Earnings Call").  During the 3Q21 Earnings Call, Defendant Mallon stated:

> We often hear NeoGenomics referred to as a fast follower. In fact, we have often used that term to describe our strategy for adopting new technologies. We've been able to execute this fast follower strategy because we have the scientific and medical know-how to quickly develop and launch new and often improved lab-developed tests, and because we have a trusted relationship with thousands of physicians who are already ordering a significant portion of their cancer testing from us.

60.    On November 4, 2021, the Company filed its third-quarter 2021 Form 10-Q with the SEC ("3Q21 10-Q"), which contained nearly identical statements to those referenced above, touting the Company's testing capabilities and competitive strengths.

61.    On February 23, 2022, the Company held a conference call to discuss its fourth-quarter and full-year 2021 financial results ("4Q21 Earnings Call").  During the 4Q21 Earnings Call, Defendant Mallon stated: "We've continued to strengthen our leadership position in the market through our comprehensive menu of tests focused only on cancer, our exceptional service levels, our managed care and hospital relationships and our overall partnership approach.  These critical differentiating factors support new growth and drive high levels of customer retention."

62.    On the 4Q21 Earnings Call, an analyst asked how the Company planned to improve its gross margins.  In response, Defendant Bonello stated: "A big part of it will be leverage of the existing fixed cost structure as revenue rebounds, and we emerge out of the COVID environment. And as we have a larger sales force that is hopefully generating revenue across that fixed COGS structure as well."

63.    On February 25, 2022, the Company filed its annual report for 2021 on Form 10-K with the SEC ("2021 Form 10-K").  The 2021 Form 10-K contained nearly identical statements to those referenced above, touting the Company's testing capabilities and competitive strengths.

64.     On March 7, 2022, the Company participated in a Raymond James Institutional
Investors Conference.  During the conference, Defendant Bonello stated: "We believe that the
underlying market that we serve is – grows at maybe a 6% to 8% rate. And from a volume
standpoint, we've grown about twice that fast, obviously through taking market share, combination
of getting more testing from our existing clients as well as continuously adding new clients."  Later
on the call, Defendant Bonello also stated: "Our molecular testing has fallen down in the low single
digits range of growth, and part of that is because people are ordering panels. Still ordering from
us, but ordering the panels instead of ordering the single-gene PCR test."

65.     The statements referenced above were false and misleading because: (i) the
Company was not a "one-stop shop" for cancer testing because it did not offer the most
technologically advanced NGS tests, which led to a significant decrease in revenue as current and
prospective customers went elsewhere for their testing needs; (ii) the Company's costs were not
fixed because the Company needed to hire additional employees to process more complex
customized testing demanded by customers utilizing the Company's outdated portfolio of tests,
leading to operational challenges, decreased lab efficiency, and increased testing turnaround times;
and (iii) the Company violated federal healthcare laws and regulations related to fraud, waste, and
abuse.

66.     On November 4, 2021, during the Company's 3Q21 Earnings Call, Defendant
McKenzie revealed that: "***We are voluntarily conducting an internal investigation with the
assistance of outside counsel that focuses on the compliance of certain consulting and service
agreements with federal healthcare laws and regulations***."  Defendant McKenzie added that,
"[b]ased on preliminary findings of this internal investigation, we voluntarily notified the Office
of the Inspector General of the U.S. Department of Health and Human Services of our investigation

in November 2021.  Though our review of this matter is ongoing, we have accrued a reserve of

$10.5 million for potential damage and liabilities associated with the federal healthcare program

revenue received spanning multiple years in connection with the agreements at issue that were

identified during the course of this internal investigation."

67.    On this news, the price of the Company's common stock fell $8.18 per share, or

17.6%, from $46.53 per share on November 3, 2021 to $38.35 per share at the close of trading on

November 4, 2021.

68.    The Company's 3Q21 Form 10-Q, which the Company filed with the SEC after the

close of trading on November 4, 2021, provided a more fulsome disclosure regarding the internal

investigation and referral to the Department of Health and Human Services:

> With the assistance of outside counsel, the Company is voluntarily conducting an
> internal investigation that focuses on the compliance of certain consulting and
> service agreements with federal healthcare laws and regulations, including those
> relating to fraud, waste and abuse. Based on this internal investigation, the
> Company voluntarily notified the Office of Inspector General of the U.S.
> Department of Health and Human Services ('OIG') of the Company's internal
> investigation in November 2021. The Company's review of this matter is ongoing.
> As of September 30, 2021, the Company has accrued a reserve of $10.5 million in
> other long-term liabilities on the Consolidated Balance Sheets for potential
> damages and liabilities primarily associated with the federal healthcare program
> revenue received by the Company in connection with the agreements at issue that
> were identified during the course of this internal investigation. This reserve reflects
> management's best estimate of the minimum probable loss associated with this
> matter. As a result of the ongoing investigation and interactions with regulatory
> authorities, the Company may accrue additional reserves for any related potential
> damages and liabilities arising out of this matter.

69.    On March 28, 2022, the Company filed a Current Report on Form 8-K with the SEC

("March 28, 2022 Form 8-K"), disclosing that "the Board of Directors and Mark Mallon, Chief

Executive Officer, have agreed that Mr. Mallon will step down as CEO and member of the Board,

effective immediately."  Also in the March 28, 2022 8-K, the Company disclosed that: "The

Company currently expects revenue for Q1 2022 may be below the low end of its prior guidance

of $118 - $120 million and EBITDA for Q1 2022 will be below the low end of its prior guidance of $(15) - $(12) million.  The larger than anticipated EBITDA loss was primarily driven by higher than anticipated Clinical Services cost of goods sold.  The Company intends to take immediate action to address performance and costs . . .  Additionally, the Company has withdrawn its 2022 annual financial guidance issued February 23, 2022."  On this news, the price of the Company's common stock fell $5.30 per share, or 29.8%, from $17.79 per share on March 28, 2022 to $12.49 per share at the close of trading on March 29, 2022.

70.     Before the start of trading on April 27, 2022, the Company filed a Current Report on Form 8-K with the SEC disclosing the Company's first-quarter 2022 financial results (the "April 27, 2022 Form 8-K").  In the April 27, 2022 Form 8-K, the Company revealed that revenue for the quarter was $117 million and EBITDA loss was $19 million.  In the April 27, 2022 Form 8-K, the Company further revealed that: "Consolidated gross profit for the first quarter of 2022" had "decrease[d] 8.0% compared to the first quarter of 2021" in part due to "higher payroll and payroll-related costs."  The Company also revealed that: "Operating expenses increased by $34 million, or 59%, compared to the first quarter of 2021" driven, in part, by "higher payroll and payroll-related costs to support the Company's strategic growth initiatives."

71.     Also, on April 27, 2022, the Company held its 1Q22 Earnings Call.  During the call, the Company discussed the factors underlying the Company's poor performance and the actions it was taking to improve performance and return to profitable growth.

72.     Defendant Bonello stated: "Our volume growth is being impacted by a couple of factors.  First, our test mix is weighted to legacy modalities and disease-specific NGS offerings, while the market is moving towards larger, more comprehensive panels.  Second, operational challenges have made it difficult to add new business at our historical rates. We are taking a

number of steps to upgrade our NGS product offering and improve our lab operations." Bonello further stated, "we are seeing some increased competition on the NGS front as panels move or as customers move to demanding larger, more comprehensive NGS-only panels, and our offering is more oriented towards smaller targeted panels."

73.     Also on the call, Defendant Bonello stated: "we've seen a notable decrease in lab efficiency over the course of the past year.  This decrease is largely attributable to increased complexity of both our product offerings and our lab processes, due in part to efforts to respond to customer requests for customization. We are already taking action to reduce this complexity. These actions include eliminating low-margin services, streamlining our NGS processes to drive reductions in labor, supplies and bioinformatics costs, while simultaneously improving turnaround time and implementing AI to increase lab tech productivity."

74.     Summarizing, Defendant Bonello further stated: "We view 2022 as a rebuilding year, where our primary focus is to improve our current product offering, drive operational efficiency, . . . and lay a foundation to support sustainable, profitable growth in 2023 and beyond."

75.     On this news, the price of the Company's common stock fell $0.41 per share, or 3.8%, from $10.85 per share on April 26, 2022 to $10.44 per share at the close of trading on April 27, 2022.

76.     Finally, on May 12, 2022, the Company participated in the Bank of America Healthcare Conference. During the conference, Defendant Bonello revealed that "over the past couple of years, we've seen perhaps a more pronounced transition to adoption of larger complete genomic profile NGS panels, then maybe the pace we had anticipated."   Also, during the conference, he added: "We're in the process of developing our own NGS only [test] rather than multimodality panels that are also complete genomic profiling and sort of more on par with what

are in some of the competitive panels as well as improving our turnaround times."

## DAMAGES TO THE COMPANY

77.     As a direct and proximate result of Defendants' conduct, the Company will lose and expend many millions of dollars.

78.     Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

79.     In addition, these losses include, but are not limited to, lavish compensation and benefits paid to Defendants who breached their fiduciary duties to the Company.

80.     As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and unjust enrichment.

## DEMAND REFUSAL ALLEGATIONS

81.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' violations of their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred during the Relevant Period.

82.     Plaintiffs will adequately and fairly represent the interests of NeoGenomics in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

83.     Plaintiffs are current owners of the Company stock and have been owners of Company stock during the Relevant Period.  Plaintiffs understand their obligation to hold stock

throughout the duration of this action and are prepared to do so.

84.     On May 8, 2023, Plaintiffs made a demand (the "Demand") on the Board of Directors (the "Board") to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants – to recover, for the benefit of the Company, the damage caused to it.  Attached hereto as **Exhibit A**, respectively, is a true and correct copy of the Demand.

85.     Following this, on May 26, 2023, counsel for the Board assured Plaintiffs that a response would be "forthcoming in the near term."  Attached hereto as **Exhibit B** is a true and correct copy of counsel for the Board's response.

86.     However, to date, no such response has been received.  Accordingly, Plaintiffs' counsel sent several follow-up communications to counsel for the Board and are yet to receive any substantive response to the Demand. Thus, the Board's inaction here constitutes a refusal of Plaintiffs' Demand.

87.     The Board here has unreasonably refused to consider Plaintiffs Demand or institute any litigation. Such refusal will irreparably prejudice the Company and its claims. The wrongs complained of in the Demand remain uncorrected and the Company will suffer additional damage as a result.

88.     In addition, the Board's refusal to initiate any litigation could subject the Company's claims to the applicable statute of limitations period, leaving the Company without remedy. Accordingly, these actions cannot be reasonably interpreted as being in the best interests of the Company.

89.     As such, the Board's response here is an unreasonable and wrongful refusal of Plaintiff's Demand to initiate a civil action for the benefit of the Company. The Company has

suffered damage and will continue to suffer damage if the wrongs complained of herein remain uncorrected. Thus, Plaintiffs have satisfied the demand requirements and may pursue this derivative action to procure a judgment in NeoGenomics favor.

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

90.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

91.     The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

92.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

93.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

94.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

95.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share

price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Waste of Corporate Assets)

96.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

97.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

98.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful action.

99.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

100.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

101.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

102.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

103.    The Individual Defendants, individually and in concert, directly or indirectly,

disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated.

105.    The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

106.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

107.    As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Relevant Period.  In ignorance of the falsity of the statements,

stockholders relied on the statements described above and/or the integrity of the market price of the Company's common stock in purchasing the Company common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

108.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(A)    Declaring that Plaintiffs may maintain this action on behalf of the Company and that Plaintiffs are adequate representatives of the Company;

(B)    Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)    Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

(E)    Awarding Plaintiffs the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(F)    Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 27, 2023

**GAINEY McKENNA & EGLESTON**

By: */s/ Gregory M. Egleston*
    Gregory M. Egleston
Thomas J. McKenna
501 Fifth Avenue, 19th Fl.
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

***Attorneys for Plaintiffs***

**VERIFICATION**

I, Marino Kain, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of NeoGenomics, Inc. common stock at all relevant times.

_____

MARINO KAIN

## VERIFICATION

I, Wayne Kerris, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of NeoGenomics, Inc. common stock at all relevant times.

WAYNE KERRIS

## VERIFICATION

I, Perry Russell, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of NeoGenomics, Inc. common stock at all relevant times.

_____
PERRY RUSSELL

# EXHIBIT A

# GAINEY McKENNA & EGLESTON

---

ATTORNEYS AT LAW

| | | |
|---|---|---|
| 501 FIFTH AVENUE<br>19th FLOOR<br>NEW YORK, NEW YORK 10017<br>TEL: (212) 983-1300<br>FAX: (212) 983-0383 | www.gme-law.com | 375 ABBOTT ROAD<br>PARAMUS, NEW JERSEY 07652<br>TEL: (201) 225-9001<br>FAX: (201) 225-9002 |

Please Reply To The New York Address

May 8, 2023

**<u>Via U.S. Mail – First Class</u>**

Mr. Christopher M. Smith
Director and Chief Executive Officer
NeoGenomics, Inc.
9490 NeoGenomics Way
Fort Myers, FL 33912

  **Re:**  **<u>Demand to Sue – NeoGenomics, Inc.</u>**

Dear Mr. Smith:

  We represent Marino Kain, Wayne Kerris and Perry Russell, who own NeoGenomics, Inc. ("NeoGenomics" or the "Company") securities.   We hereby demand that the Company's Board of Directors (the "Board") take action against certain current and/or former officers and directors of the Company, including, Lynn Tetrault, Dr. Alison Hannah, Bruce Crowther, Michael Kelly, Stephen Kanovsky, Michael Kelly, David Perez, Rachel Stahler, Douglas VanOort, Mark Mallon, Kathryn McKenzie, and William Bonello and other individuals and entities that engaged in the wrongdoing as set forth below.

**<u>Background</u>**

  As you are aware, the Company provides cancer tests and testing services to doctors, clinics, hospitals, and pharmaceutical companies.   Among the Company's portfolio of tests are next generation sequencing ("NGS") tests.

  Throughout the relevant period (February 27, 2020 and April 26, 2022), the officers and directors of the Company caused the Company to allegedly misrepresent to the market that it had a "comprehensive menu" of cancer tests that positioned it as a "one-stop-shop" for pathologists that needed cancer testing.   Moreover, the officers and directors of the Company caused the Company to state that it had "every kind of testing modality that you can use for cancer, including

*Mr. Christopher M. Smith*
*May 8, 2023*
*Page 2*

some of the fast-growing new ones, like next-generation sequencing," and had "a competitive advantage" as a "go-to reference lab with a comprehensive menu for just about any kind of tests that you want to have done in cancer [] and we keep our test menu very advanced."   Further, the officers and directors of the Company caused the Company to assert that it could "leverage" the supposedly "fixed cost" structure of its business to improve profitability as revenue increased and also repeatedly touted its "robust Compliance Program . . . overseen by our Board of Directors . . . to ensure compliance with the myriad of . . . laws, regulations and governmental guidance applicable to our business," merely listing failure to comply among the many hypothetical risks that could impact the Company's results.

These statements were allegedly false and misleading. In truth: (i) the Company was anything but a "one-stop-shop" for cancer testing because it did not offer the most technologically advanced NGS tests, which led to a significant decrease in revenue as current and prospective customers went elsewhere for their testing needs; (ii) the Company's costs were not fixed because it needed to hire additional employees to process more complex customized testing demanded by customers utilizing the Company's outdated portfolio of tests, leading to operational challenges, decreased lab efficiency, and increased testing turnaround times; and (iii) the Company violated federal healthcare laws and regulations related to fraud, waste, and abuse.

On November 4, 2021, the Company revealed that it was "conducting an internal investigation with the assistance of outside counsel that focuses on the compliance of certain consulting and service agreements with federal healthcare laws and regulations" and had recently "notified the Office of the Inspector General of the U.S. Department of Health and Human Services of our investigation." Additionally, the Company disclosed that it "accrued a reserve of $10.5 million for potential damage and liabilities associated with the federal healthcare program revenue received spanning multiple years."[1]   On this news, the price of the Company common stock fell

---

[1]       "With the assistance of outside counsel, the Company voluntarily conducted an internal investigation that focused on the compliance of certain consulting and service agreements with federal healthcare laws and regulations, including those relating to fraud, waste and abuse. Based on this internal investigation, the Company voluntarily notified the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG") of the Company's internal investigation in November 2021. The Company's interactions with regulatory authorities and the Company's related review of this matter are ongoing. ***The Company has a reserve of $11.2 million in other long-term liabilities as of December 31, 2022 and 2021 on the Consolidated Balance Sheets for potential damages and liabilities primarily associated with the federal healthcare program revenue received by the Company in connection with the agreements at issue that were identified during the course of this internal investigation***. This reserve reflects management's best estimate of the minimum probable loss associated with this matter. As a result of the internal investigation and ongoing interactions with regulatory authorities, the Company may accrue additional reserves for any related potential damages and liabilities arising out of this matter. ***The Company was notified on June 30, 2022 that the Department of Justice ("DOJ") will be participating in the investigation of this matter.*** At this time, the Company is unable to predict the duration, scope, result or related costs associated with any further investigation, including by the OIG, DOJ, or any other governmental authority, or what penalties or remedial actions they may seek. Accordingly, at this time, the Company is unable to estimate a range of possible loss in excess of the amount reserved. Any determination that the Company's operations or activities are not in compliance with existing laws or regulations, however, could result in the imposition of civil or criminal fines, penalties, disgorgement, restitution, equitable relief,

*Mr. Christopher M. Smith*
*May 8, 2023*
*Page 3*

$8.18 per share, or 17.6%, from $46.53 per share on November 3, 2021 to $38.35 per share at the close of trading on November 4, 2021.

After the close of trading on November 4, 2021, the Company provided some limited additional details about the internal investigation, specifically that the "federal healthcare laws and regulations" at the center of the Company's investigation "include those relating to fraud, waste and abuse."

On March 28, 2022, the Company disclosed that "the Board of Directors and Mark Mallon, Chief Executive Officer, have agreed that Mr. Mallon will step down as CEO and member of the Board, effective immediately." At the same time, the Company disclosed that it "currently expects revenue for Q1 2022 may be below the low end of its prior guidance of $118 - $120 million and EBITDA for Q1 2022 will be below the low end of its prior guidance of $(15) - $(12) million. The larger than anticipated EBITDA loss was primarily driven by higher than anticipated Clinical Services cost of goods sold. The Company intends to take immediate action to address performance and costs . . . Additionally, the Company has withdrawn its 2022 annual financial guidance issued February 23, 2022." On this news, the price of the Company common stock fell $5.30 per share, or 29.8%, from $17.79 per share on March 28, 2022 to $12.49 per share at the close of trading on March 29, 2022.

Then, on April 27, 2022, the Company reported its first-quarter 2022 financial results including that revenue for the quarter was $117 million and EBITDA loss was $19 million, that "[c]onsolidated gross profit for the first quarter of 2022" had "decrease[d] 8.0% compared to the first quarter of 2021," and that "[o]perating expenses increased by $34 million, or 59%, compared to the first quarter of 2021." The Company explained that "higher payroll and payroll related costs to support the Company's strategic growth initiatives" drove the decreased profit and increased operating expenses.

Also, on April 27, 2022, the Company held a conference call to discuss its first quarter 2022 results (the "1Q22 Earnings Call"). During the 1Q22 Earnings Call, the Company attributed its poor performance in substantial part to the fact that: "our test mix is weighted to legacy modalities and disease-specific NGS offerings, while the market is moving towards larger, more comprehensive panels" and "we've seen a notable decrease in lab efficiency over the course of the past year . . . largely attributable to increased complexity of both our product offerings and our lab processes, due in part to efforts to respond to customer requests for customization." The Company further disclosed that it was "seeing increased competition on the NGS front as panels move or as customers move to demanding larger, more comprehensive NGS-only panels, and our offering is more oriented towards smaller targeted panels" and that the Company was "seeing bigger and bigger panels coming from some of these emerging companies . . . where we have not kept up." On this news, the price of the Company common stock fell $0.41 per share, or 3.8%, from $10.85 per share on April 26, 2022 to $10.44 per share at the close of trading on April 27, 2022.

---

exclusion from participation in federal healthcare programs or other losses or conduct restrictions, which could be material to the Company's financial results or business operations." *See* Company's Form 10-K, filed Feb. 24, 2023 (Emphasis added).

*Mr. Christopher M. Smith*
*May 8, 2023*
*Page 4*

On December 6, 2022, a securities class action was filed entitled *Goldenberg v. NeoGenomics, Inc., et al.*, Case No. 1:22-cv-10314 (S.D.N.Y.).

## ACTION DEMANDED

Our clients demand that the Board commence a civil action against each responsible individual and entity and each responsible affiliate of the Company, including, Lynn Tetrault, Dr. Alison Hannah, Bruce Crowther, Michael Kelly, Stephen Kanovsky, Michael Kelly, David Perez, Rachel Stahler, Douglas VanOort, Mark Mallon, Kathryn McKenzie, and William Bonello and other individuals and entities that engaged in the wrongdoing, to recover for the benefit of the Company. The Company must recover from the aforementioned individuals the amount of damages sustained by the Company as a result of their breaches of fiduciary duties, and the amount of damages sustained by the Company as a result of their aforementioned individuals' breaches of fiduciary duties.

Please confirm receipt of this letter and the measures that you plan to take to address the harm inflicted upon the Company as a result of the conduct described herein. If you have any questions, please do not hesitate to contact the undersigned counsel. We are willing to assist the Board as it conducts the investigation and will review and comment upon all reports and information generated in the course of its work.

Very truly yours,

**GAINEY McKENNA & EGLESTON**

*Gregory M. Egleston*

Gregory M. Egleston

cc:     Thomas J. McKenna, Esq. (By email)

# EXHIBIT B

## Greg Egleston

| | |
|---|---|
| **From:** | Colleen.Smith@lw.com |
| **Sent:** | Sunday, November 5, 2023 5:35 PM |
| **To:** | Greg Egleston |
| **Cc:** | T.J. McKenna |
| **Subject:** | RE: NeoGeonomics |

The special committee is still evaluating the claims and awaiting the amended complaint in the securities case.

**Colleen C. Smith**

**LATHAM & WATKINS LLP**
12670 High Bluff Drive | San Diego, CA 92130
D: +1.858.523.3985

**From:** Greg Egleston <egleston@gme-law.com>
**Sent:** Thursday, October 26, 2023 12:48 PM
**To:** Smith, Colleen (SD) <Colleen.Smith@lw.com>
**Cc:** T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** RE: NeoGeonomics

Hi Colleen: Status please.  Regards, Greg

Gregory M. Egleston
*Gainey McKenna & Egleston*
501 Fifth Avenue, 19th Floor
New York, New York 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Website: www.gme-law.com

**From:** Greg Egleston
**Sent:** Wednesday, October 18, 2023 10:44 AM
**To:** Colleen.Smith@lw.com
**Cc:** T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** RE: NeoGeonomics

Hi Colleen:  Please let us know what has transpired.  Regards, Greg

Gregory M. Egleston
*Gainey McKenna & Egleston*
501 Fifth Avenue, 19th Floor
New York, New York 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Website: www.gme-law.com

**From:** Colleen.Smith@lw.com <Colleen.Smith@lw.com>
**Sent:** Sunday, October 1, 2023 3:20 AM
**To:** Greg Egleston <egleston@gme-law.com>
**Cc:** T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** RE: NeoGeonomics

Thanks for your patience here.  Meeting has been rescheduled to October 3, after which I expect to have a response to you.

**Colleen C. Smith**

**LATHAM & WATKINS LLP**
12670 High Bluff Drive | San Diego, CA 92130
D: +1.858.523.3985

**From:** Greg Egleston <egleston@gme-law.com>
**Sent:** Monday, September 25, 2023 10:07 AM
**To:** Smith, Colleen (SD) <Colleen.Smith@lw.com>
**Cc:** T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** RE: NeoGeonomics

Hi Colleen:  Please provide us with a substantive response regarding our demand.  Regards, Greg

Gregory M. Egleston
*Gainey McKenna & Egleston*
501 Fifth Avenue, 19th Floor
New York, New York 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Website: www.gme-law.com

**From:** Greg Egleston
**Sent:** Tuesday, September 12, 2023 10:46 AM
**To:** Colleen.Smith@lw.com
**Cc:** T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** RE: NeoGeonomics

Hi Colleen:  Please let me know after you meet with the Board. Regards, Greg

Gregory M. Egleston
*Gainey McKenna & Egleston*
501 Fifth Avenue, 19th Floor
New York, New York 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Website: www.gme-law.com

**From:** Colleen.Smith@lw.com <Colleen.Smith@lw.com>
**Sent:** Tuesday, September 5, 2023 2:47 PM
**To:** Greg Egleston <egleston@gme-law.com>

**Cc:** T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** RE: NeoGeonomics

Hi Greg –

Received your note.  I'm meeting with the board next week, and will respond immediately thereafter if that works.  Thanks.

**Colleen C. Smith**

**LATHAM & WATKINS LLP**
12670 High Bluff Drive | San Diego, CA 92130
D: +1.858.523.3985

**From:** Greg Egleston <egleston@gme-law.com>
**Sent:** Friday, September 01, 2023 11:44 AM
**To:** Smith, Colleen (SD) <Colleen.Smith@lw.com>
**Cc:** T.J. McKenna <TJMcKenna@gme-law.com>
**Subject:** NeoGeonomics

Colleen:  Please let us have your response after the holiday weekend.  Regards, Greg

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.